IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **David Catanzaro,** | : | |
| | : | |
| Plaintiff, | : | Case No. 1:13-cv-00996 |
| | : | |
| v. | : | Judge Polster |
| | : | |
| **Seaman Garson LLC/LLP, et al.,** | : | Magistrate Judge White |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S MOTION TO RECONSIDER
AUGUST 21, 2014 ORDER**

Plaintiff, David Catanzaro, respectfully moves this Court to reconsider the portion of its August 21, 2014 order directing Mr. Catanzaro to produce his tax returns from 2007 to present. Production of tax returns from the years 2010, 2012, and 2013 violates Mr. Catanzaro's privacy rights and the public policy against disclosure of tax returns because whatever relevant information those tax returns might contain -- if any -- is readily available from other sources. As such, and as more fully explained in the attached memorandum in support, the tax returns from those years are not discoverable.  In an effort to provide the defendants with the information that they claim is relevant, Mr. Catanzaro is willing to produce tax returns from the years 2001 to 2009 and 2011 for the reasons explained in the memorandum in support.  But Mr. Catanzaro asks the Court to modify the August 21 order to exclude tax returns from 2010, 2012, and 2013.

Respectfully submitted,

/s/ Barton R. Keyes
Rex H. Elliott                  (0054054)
Charles H. Cooper, Jr.      (0037295)
Barton R. Keyes             (0083979)
Cooper & Elliott, LLC
2175 Riverside Drive
Columbus, Ohio 43221
(614) 481-6000
(614) 481-6001 (Facsimile)
rexe@cooperelliott.com
chipc@cooperelliott.com
bartk@cooperelliott.com

Attorneys for Plaintiff
David Catanzaro

## **MEMORANDUM IN SUPPORT**

Federal district courts recognize that requiring a litigant to produce tax returns implicates significant privacy interests. As such, courts have acknowledged a public policy against disclosure of tax returns. Courts thus routinely treat tax returns differently from other types of records sought in discovery, and require production only when the information contained in the tax returns is relevant and not readily available from another source.

In this case, tax returns from three of the years noted in the Court's August 21 order do not meet the standards for production. Tax returns for the year 2010 are not even arguably relevant. And the only conceivable relevance of tax returns for 2012 and 2013 would relate to money Mr. Catanzaro had made from licensing agreements for the patent at issue in this case. That information is readily available from other sources--the licensing agreements themselves. Accordingly, no basis exists for discovery of tax returns for these three years.

2

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

### A. Mr. Catanzaro receives the '532 and '959 patents.

This case arises out of the actions by the defendants while representing Mr. Catanzaro, a patent owner. Mr. Catanzaro owned two United States patents: Patent number 6,026,532 (dated February 22, 2000) and Patent number 7,653,959 B1 (dated February 2, 2010). The '959 patent is a continuation of the '532 patent. [Catanzaro Dec. ¶2.]

***The '532 Patent.*** Mr. Catanzaro filed the application for what would become the '532 patent on December 30, 1996. The application was for a toothbrush assembly that allowed a toothbrush to be in the shape of an animate or inanimate object to stand vertically within a specifically defined foot stand and/or in combination with a base. Over the next several years, Mr. Catanzaro worked with the U.S. Patent and Trademark Office to gain allowance of his patent. The PTO sent Mr. Catanzaro notice that his patent would be allowed on August 3, 1999. [Catanzaro Dec. ¶3.]

The '532 patent issued the following February. But because of his financial circumstances, Mr. Catanzaro could not afford to pay the maintenance fees for the '532 patent. The patent expired in February 2004 for nonpayment of maintenance fees. [Catanzaro Dec. ¶4.]

In January 2010, Mr. Catanzaro submitted a petition to the PTO to revive his '532 patent. As grounds, Mr. Catanzaro cited extreme financial hardship that made the delay in paying maintenance fees unavoidable. Mr. Catanzaro had struggled financially during the time period when his maintenance fee payments were due. During this time, Mr. Catanzaro's sole business was as a musician. In 2007 and 2008, he played numerous shows for U.S. troops around the country. But he was not paid for those shows; his income from music was limited to what little he earned selling recordings of his music. [Catanzaro Dec. ¶5.]

To support his claim of extreme financial hardship, Mr. Catanzaro provided the PTO copies of his tax returns for the years 2003 through 2009.  In July 2010, the PTO found that Mr. Catanzaro's extreme financial hardship made delay in paying the maintenance fees unavoidable and revived the '532 patent.  [Catanzaro Dec. ¶6.]

*The '959 Patent.*  Mr. Catanzaro filed the application for what would become the '959 patent on February 17, 2000.  This application was a continuation of the application for the '532 patent and therefore had the same December 30, 1996 priority date.  It sought a patent for an article assembly comprised of the same specifically defined foot stand of the '532 patent, but having a recess to receive any article, not just a toothbrush. The recess in the foot stand of both patents could pass through in-and-out and align with a recess in an adjoining base.  Thus, while the '532 patent was for a complete toothbrush assembly including a foot stand and/or base, the application that ultimately resulted in the '959 patent was for a foot stand and/or base themselves or in combination with any article, without being limited to a toothbrush assembly.  [Catanzaro Dec. ¶7.]

While the application was pending, the PTO required Mr. Catanzaro to execute a "terminal disclaimer" to avoid a double-patenting rejection.  In the event the PTO issued a patent on the application, the terminal disclaimer disclaimed the balance of the term of that patent that would exceed the term of the '532 patent.  The terminal disclaimer also provided:

> **"The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the prior patent are commonly owned."**

[Catanzaro Dec. ¶8.]

The PTO sent notice in October 2001 that it would allow the patent.  But because of Mr. Catanzaro's financial struggles, he could not pay the issue fee.  The PTO sent notice on October 28, 2002 that the application was abandoned because of the failure to pay the issue fee.  Mr.

4

Catanzaro petitioned the PTO for revival of the application in June of 2008, citing extreme financial hardship as the reason for failing to pay the necessary fees. The PTO initially rejected the petition. Mr. Catanzaro filed a renewed petition in October 2008, along with tax returns from 2002 through 2007 to demonstrate his financial circumstances. Mr. Catanzaro later provided tax returns for 2001 to show financial hardship for the entire period that the issue fee could have been paid. After receiving this financial information, the PTO granted the revival in November 2009. The '959 patent issued in February 2010. [Catanzaro Dec. ¶9.]

**B.** **The Defendants cause Mr. Catanzaro to lose his right to enforce the '959 patent.**

In 2008, Mr. Catanzaro filed a patent infringement complaint against Proctor & Gamble. Proctor & Gamble was distributing an electronic toothbrush product line under the trade name "Spinbrush." These toothbrushes used animate or inanimate objects for the handle of a brush, such as an astronaut, mermaid, or dolphin. The bottom of the assembly was a defined foot stand that allowed the toothbrush to stand vertically. Mr. Catanzaro alleged that this product infringed on his '532 toothbrush assembly patent. [Catanzaro Dec. ¶10.]

Initially, Mr. Catanzaro proceeded *pro se* against Proctor & Gamble. But he eventually retained the defendants, Wayne Porter, James DeRoche, and Mr. DeRoche's law firm Seaman Garson to represent him in the Spring of 2009. Although the only infringement claims in the Proctor & Gamble lawsuit were for the '532 patent, the defendants knew that Mr. Catanzaro also owned the '959 continuation patent. As the Proctor & Gamble case approached a February 2011 mediation date, Mr. Catanzaro told the defendants that if the case settled, he would prefer that the settlement be drafted as an assignment of the '532 patent so that Mr. Catanzaro could receive favorable capital gains tax treatment for the settlement. But, the defendants also knew that Mr. Catanzaro wanted to retain the right to enforce the '959 patent. Even so, and despite the fact that

5

<u>terminal disclaimers are a common requirement to obtain a continuation patent, the defendants did not ask Mr. Catanzaro if the '959 patent had a terminal disclaimer; they did not tell Mr. Catanzaro to check in the '959 patent history for a terminal disclaimer; they did not look themselves in the '959 patent history for a terminal disclaimer; and they did not warn Mr. Catanzaro that if there were a terminal disclaimer in the '959 patent history, the assignment of the '532 patent would eliminate Mr. Catanzaro's right to enforce the '959 patent.</u>  [Catanzaro Dec. ¶11.]

The parties in the Proctor & Gamble case agreed to settle the case at mediation. Mr. Porter and Mr. DeRoche drafted a settlement agreement that 1) assigned the '532 patent to Church & Dwight (an additional defendant) and 2) granted a nonexclusive license to use the '959 patent to Proctor & Gamble and Church & Dwight. Mr. Porter and Mr. DeRoche drafted the settlement agreement this way because they knew that Mr. Catanzaro wanted to keep the right to enforce the '959 patent. [Catanzaro Dec. ¶12.]

For the next year, Mr. Catanzaro enforced his '959 patent. Mr. Catanzaro reached licensing or settlement agreements with eight product manufacturers that were making or had made products that appeared to infringe on his patent. Mr. Catanzaro received a total of about $274,000 for these agreements (an average of over $34,000 per license).[1] Eventually, one of the manufacturers that Mr. Catanzaro was negotiating with learned that Mr. Catanzaro had assigned the '532 patent. This manufacturer told Mr. Catanzaro (without even looking at the '959 patent history) that the '959 patent would contain a terminal disclaimer. The manufacturer told Mr. Catanzaro this meant the '959 patent was unenforceable. Mr. Catanzaro was still able to negotiate an agreement with this manufacturer because Mr. Catanzaro owned both patents at the

---

[1] To date, Mr. Catanzaro has located approximately fifty additional products that contain the same elements as the products for which he had entered licensing or settlement agreements.

6

time the manufacturer was selling its infringing product, and because Mr. Catanzaro believed that he would be able to acquire the '532 patent back from Church & Dwight. Mr. Catanzaro stated these facts to the manufacturer, and the manufacturer was willing to enter the agreement for $45,000 based on this information during the same meeting. [Catanzaro Dec. ¶13.]

Mr. Catanzaro immediately notified defendants Porter and DeRoche of the terminal disclaimer issue. The defendants assured Mr. Catanzaro that they would take care of it. The defendants tried to get Church & Dwight to assign the '532 patent back to Mr. Catanzaro so that he would have joint ownership, but Church & Dwight refused. At that point, the defendants ceased all efforts to fix their error and told Mr. Catanzaro that he still had rights in the '959 patent (a point that Mr. Catanzaro now understands is blatantly wrong under federal law). [Catanzaro Dec. ¶14.]

<u>The defendants' failure to advise Mr. Catanzaro of the implications of assigning the '532 patent gave rise to this lawsuit.</u> Mr. Catanzaro had to file this lawsuit to protect his interests. Because of the terminal disclaimer issue and the public nature of this lawsuit, Mr. Catanzaro can no longer enforce his '959 patent. [Catanzaro Dec. ¶15.]

**C.** **<u>Defendants seek ten years of tax returns; the Court orders Mr. Catanzaro to produce tax returns for 2007 to present.</u>**

In discovery, each of the defendants asked Mr. Catanzaro to produce his tax returns from the year 2003 to present. Mr. Catanzaro objected to producing these documents. Counsel for Mr. DeRoche and counsel for Mr. Catanzaro exchanged letters regarding their positions on the tax returns. Counsel did not raise the tax return issue after that until the August 20, 2014 status conference with the Court. The defendants never filed a motion to compel, so neither party had a chance to brief the issue of whether the tax returns should be discoverable. The Court indicated

7

that the plaintiff would have to produce tax returns from 2007 to present under a protective order, and issued an order directing such the next day.

After the Court issued its August 21 order, and in an effort to avoid having to file this motion for reconsideration, counsel for Mr. Catanzaro offered to produce 1) the tax returns that Mr. Catanzaro relied upon to revive the '532 patent and the '959 application (2001 through 2009); and 2) the tax return that would reflect the capital gains treatment of the settlement payment from the Proctor & Gamble case (2011).  [*See* Exhibit A, August 28, 2014 email.] Counsel for the defendants rejected this offer.

In order to protect Mr. Catanzaro's privacy interests, and to provide the Court with the relevant analysis and authority on this issue, Mr. Catanzaro files this motion to reconsider.

## II.     LAW AND ARGUMENT

A.     **The tax returns for 2010, 2012, and 2013 are not discoverable.**

Although tax returns may not be fully privileged from discovery, courts recognize that production of tax returns implicates privacy interests.  The mere fact that a plaintiff claims economic loss in a lawsuit does not automatically make his tax returns discoverable.  Rather, courts (including District Courts within the Sixth Circuit) regularly hold that production should only be ordered when the returns are clearly relevant and the relevant information is not otherwise readily available.  For example, in *Smith v. Mpire Holdings, LLC*, the court explained:

> Tax returns are subject to discovery in civil litigation between private parties. *See Credit Life Ins. Co. v. Uniworld Ins. Co.,* 94 F.R.D. 113, 119 (S.D.Ohio 1982). However, there are limitations to when a party may be ordered to provide tax returns to an opposing party. Tax returns are discoverable (1) where they are relevant to the action or the issues raised thereunder and (2) the material is otherwise not readily available. *Burket v. Hyman Lippitt, P.C.,* 2007 WL 2214302 at *2 (W.D.Mich. July 27, 2007) (citing cases).

8

> *Smith v. Mpire Holdings, LLC*, CIV. 3:08-0549, 2010 WL 711797
> (M.D. Tenn. Feb. 22, 2010) (emphasis added).

Several other cases recognize a policy against unnecessary disclosure. For example:

- *Credit Life Ins. Co. v. Uniword Ins. Co. Ltd.*, **94 F.R.D. 113 (S.D. Ohio 1982):** "Although tax returns are not privileged, there is a public policy against unnecessary disclosure, in order that taxpayers can be encouraged to file accurate returns." (citing *Premium Service Corp. v. Sperry & Hutchinson Co.*, 511 F.2d 225, 229 (9th Cir. 1975)).

- *BM Investments, LLC v. Hamilton Family, L.P.*, **No. 06-14991, 2008 WL 1995101, \*4 (E.D. Mich. May 6, 2008):** "Tax returns are discoverable where they are relevant to the action or the issues raised thereunder and the material is not otherwise readily available."

- *Cooper & Hallgarten & Co.*, **34 F.R.D. 482, 483–84 (S.D.N.Y. 1964):** "But assuming that a litigant's tax returns are not privileged and are subject to pretrial procedure, the public policy against disclosure cannot be ignored; it must be taken into account together with the policy which favors liberal pretrial discovery. Giving appropriate weight to each, the production of tax returns should not be ordered unless it clearly appears they are relevant to the subject matter of the action or to the issues raised thereunder, and further, that there is a compelling need therefor because the information contained therein is not otherwise readily obtainable."

In this case, the public policy against disclosure of tax returns should prevail as to the years 2010, 2012, and 2013. Although Mr. Catanzaro disputes that any of his tax returns are relevant in this case, he acknowledges that his 2001 through 2009 tax returns were used to revive his '532 patent and the '959 application. He also acknowledges that his 2011 tax returns relate to the favorable capital gains tax treatment that led him to ask the defendants to structure the Proctor and Gamble settlement as an assignment of the '532 patent.

The tax returns for 2010, 2012, and 2013 are different. The defendants cannot point to anything that would make the 2010 tax returns even arguably relevant. And while the licensing agreements Mr. Catanzaro entered for the '959 patent were executed in 2012 and 2013, the amounts of those licensing agreements are readily available from another source: the licensing agreements themselves, which Mr. Catanzaro has already produced in this lawsuit. This is not a

9

case where the economic loss comes in the form of lost wages or some other type of income verifiable only from tax returns. Rather, the loss is Mr. Catanzaro's inability to enforce his '959 patent. And the value of that loss is plainly apparent on the face of the past licensing agreements. As such, tax returns are unnecessary to show Mr. Catanzaro's economic loss, and the public policy against disclosure of tax returns should prevent discovery of the 2010, 2012, and 2013 returns.

### III.  CONCLUSION

Mr. Catanzaro's economic loss from his inability to enforce his '959 patent is plainly apparent on the face of the licensing agreements he entered. As such, the 2010, 2012, and 2013 tax returns do not contain any relevant information that is not readily available from another source. On these facts, the public policy against disclosure should protect Mr. Catanzaro's privacy interests. In an effort to provide the defendants with the information that they claim is relevant, Mr. Catanzaro is willing to produce tax returns from the years 2001 to 2009 and 2011 But Mr. Catanzaro asks the Court to reconsider its August 21 order and exclude the 2010, 2012, and 2013 tax returns from production.

Respectfully submitted,

/s/ Barton R. Keyes
Rex H. Elliott              (0054054)
Charles H. Cooper, Jr.      (0037295)
Barton R. Keyes             (0083979)
Cooper & Elliott, LLC
2175 Riverside Drive
Columbus, Ohio  43221
(614) 481-6000
(614) 481-6001 (Facsimile)
rexe@cooperelliott.com
chipc@cooperelliott.com
bartk@cooperelliott.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Plaintiff's Motion to Reconsider August 21, 2014 Order was filed electronically and served electronically on the following counsel of record, this 2nd day of September, 2014:

>Thomas S. Mazanec, Esq.
>Elaine Tso, Esq.
>Mazanec, Raskin & Ryder Co., L.P.A.
>100 Franklin's Row
>34305 Solon Road
>Cleveland, Ohio  44139
>
>Attorneys for Defendant
>Wayne D. Porter, Jr.
>
>
>Monica A. Sansalone, Esq.
>Timothy T. Brick, Esq.
>Shane A. Lawson, Esq.
>Gallagher Sharp
>Sixth Floor - Bulkley Building
>1501 Euclid Avenue
>Cleveland, Ohio  44115
>
>Attorneys for Defendants
>Seaman Garson, LLC/LLP and
>James A. Deroche

>/s/ Barton R. Keyes