# DECLARATION OF DAVID CATANZARO

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **David Catanzaro,** | : | |
| | : | |
| Plaintiff, | : | Case No. 1:13-cv-00996 |
| | : | |
| v. | : | Judge Polster |
| | : | |
| **Seaman Garson LLC/LLP, et al.,** | : | Magistrate Judge White |
| | : | |
| Defendants. | : | |

### DECLARATION OF PLAINTIFF, DAVID CATANZARO, IN SUPPORT OF MOTION TO RECONSIDER AUGUST 21, 2014 ORDER

I, David J. Catanzaro, declare the following under penalty of perjury:

1. I am the plaintiff in this case. I am over eighteen years of age and competent to make this declaration. I have personal knowledge of the facts contained in this declaration.

2. I am a patent owner. This case arises out of the actions by the defendants while representing me. I owned two United States patents: Patent number 6,026,532 (dated February 22, 2000) and Patent number 7,653,959 B1 (dated February 2, 2010). The '959 patent is a continuation of the '532 patent.

### The '532 Patent

3. I filed the application for what would become the '532 patent on December 30, 1996. The application was for a toothbrush assembly that allowed a toothbrush to be in the shape of an animate or inanimate object to stand vertically within a specifically defined foot stand and/or in combination with a base. Over the next several years, I worked with the U.S. Patent and Trademark Office to gain allowance of my patent. The PTO sent me notice that my patent would be allowed on August 3, 1999.

4.     The '532 patent issued the following February. But because of my financial circumstances, I could not afford to pay the maintenance fees for the '532 patent. The patent expired in February 2004 for nonpayment of maintenance fees.

5.     In January 2010, I submitted a petition to the PTO to revive my '532 patent. As grounds, I cited extreme financial hardship that made the delay in paying maintenance fees unavoidable. I had struggled financially during the time period when the maintenance fee payments were due. During this time, my sole business was as a musician. In 2007 and 2008, I played numerous shows for U.S. troops around the country. But I was not paid for those shows; my income from music was limited to what little I earned selling recordings of my music.

6.     To support my claim of extreme financial hardship, I provided the PTO copies of my tax returns for the years 2003 through 2009. In July 2010, the PTO found that my extreme financial hardship made delay in paying the maintenance fees unavoidable and revived the '532 patent.

### The '959 Patent

7.     I filed the application for what would become the '959 patent on February 17, 2000. This application was a continuation of the application for the '532 patent and therefore had the same December 30, 1996 priority date. It sought a patent for an article assembly comprised of the same specifically defined foot stand of the '532 patent, but having a recess to receive any article, not just a toothbrush. The recess in the foot stand of both patents could pass through in-and-out and align with a recess in an adjoining base. Thus, while the '532 patent was for a complete toothbrush assembly including a foot stand and/or base, the application that ultimately resulted in the '959 patent was for a foot stand and/or base themselves or in combination with any article, without being limited to a toothbrush assembly.

2

8.  While the application was pending, the PTO required me to execute a "terminal disclaimer" to avoid a double-patenting rejection. In the event the PTO issued a patent on the application, the terminal disclaimer disclaimed the balance of the term of that patent that would exceed the term of the '532 patent. The terminal disclaimer also provided:

> **"The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the prior patent are commonly owned."**

9.  The PTO sent notice in October 2001 that it would allow the patent. But because of my financial struggles, I could not pay the issue fee. The PTO sent notice on October 28, 2002 that the application was abandoned because of my failure to pay the issue fee. I petitioned the PTO for revival of the application in June of 2008, citing extreme financial hardship as the reason for failing to pay the necessary fees. The PTO initially rejected the petition. I filed a renewed petition in October 2008, along with tax returns from 2002 through 2007 to demonstrate my financial circumstances. I later provided tax returns for 2001 to show financial hardship for the entire period that the issue fee could have been paid. After receiving this financial information, the PTO granted the revival in November 2009. The '959 patent issued in February 2010.

## The Defendants' Acts

10. In 2008, I filed a patent infringement complaint against Proctor & Gamble. Proctor & Gamble was distributing an electronic toothbrush product line under the trade name "Spinbrush." These toothbrushes used animate or inanimate objects for the handle of a brush, such as an astronaut, mermaid, or dolphin. The bottom of the assembly was a defined foot stand that allowed the toothbrush to stand vertically. I alleged that this product infringed on my '532 toothbrush assembly patent.

3

11. Initially, I proceeded *pro se* against Proctor & Gamble. But I eventually retained the defendants, Wayne Porter, James DeRoche, and Mr. DeRoche's law firm Seaman Garson to represent me in the Spring of 2009. Although the only infringement claims in the Proctor & Gamble lawsuit were for the '532 patent, the defendants knew that I also owned the '959 continuation patent. As the Proctor & Gamble case approached a February 2011 mediation date, I told the defendants that if the case settled, I would prefer that the settlement be drafted as an assignment of the '532 patent so that I could receive favorable capital gains tax treatment for the settlement. But, the defendants also knew that I wanted to retain the right to enforce the '959 patent. The defendants did not ask me if the '959 patent had a terminal disclaimer; they did not tell me to check in the '959 patent history for a terminal disclaimer; to my knowledge they did not look themselves in the '959 patent history for a terminal disclaimer; and they did not warn me that if there were a terminal disclaimer in the '959 patent history, the assignment of the '532 patent would eliminate my right to enforce the '959 patent.

12. The defendants in the Proctor & Gamble case and I agreed to settle the case at mediation. Mr. Porter and Mr. DeRoche drafted a settlement agreement that 1) assigned the '532 patent to Church & Dwight (an additional defendant) and 2) granted a nonexclusive license to use the '959 patent to Proctor & Gamble and Church & Dwight. I understand that Mr. Porter and Mr. DeRoche drafted the settlement agreement this way because they knew that I wanted to keep the right to enforce the '959 patent.

13. For the next year, I enforced my '959 patent. I reached licensing or settlement agreements with eight product manufacturers that were making or had made products that appeared to infringe on my patent. I received a total of about $274,000 for these agreements (an

average of over $34,000 per license).[1]  Eventually, one of the manufacturers that I was negotiating with learned that I had assigned the '532 patent.  This manufacturer told me (without even looking at the '959 patent history) that the '959 patent would contain a terminal disclaimer.  The manufacturer told me this meant the '959 patent was unenforceable.  I was still able to negotiate an agreement with this manufacturer because I owned both patents at the time the manufacturer was selling its infringing product, and because I believed that I would be able to acquire the '532 patent back from Church & Dwight.  I stated these facts to the manufacturer, and the manufacturer was willing to enter the agreement for $45,000 based on this information during the same meeting.

14. I immediately notified Mr. Porter and Mr. DeRoche of the terminal disclaimer issue.  They assured me that they would take care of it.  I understand that they tried to get Church & Dwight to assign the '532 patent back to me so that I would have joint ownership, but Church & Dwight refused.  At that point, Mr. Porter and Mr. DeRoche ceased all efforts to fix their error and told me that I still had rights in the '959 patent (a point that I now understand is blatantly wrong under federal law).

15. Mr. Porter and Mr. DeRoche's failure to advise me of the implications of assigning the '532 patent gave rise to this lawsuit.  I had to file this lawsuit to protect my interests.  Because of the terminal disclaimer issue and the public nature of this lawsuit, I can no longer enforce my '959 patent.

David Catanzaro

Dated: September 2, 2014

---

[1] To date, I have located approximately fifty additional products that contain the same elements as the products for which I had entered licensing or settlement agreements.

5